IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRUCE E. ROBINSON, TRUSTEE, *et al.*,

    *Counterclaim Plaintiff,*

v.                                         Civil No. 3:15cv382-JAG-3

STERNE AGEE GROUP, INC.,

    *Counterclaim Defendant,*

## OPINION

In May of 2014, an involuntary bankruptcy proceeding began against Anderson & Strudwick, Inc ("Anderson"). Prior to the bankruptcy proceeding, Anderson merged its assets with the Sterne Agee Group, Inc. ("SAG"). In late 2014, SAG brought a declaratory action in Bankruptcy Court to determine the rights to common stock held in an escrow account ("Escrow Funds"). The Trustee filed counterclaims, asserting that SAG had no rights to the Escrow Funds. On May 26, 2015, five months after the Trustee filed his counterclaims, SAG filed a Motion to Withdraw Reference and to Sever, Transfer and Consolidate the Counterclaims.

SAG claims that the Court should grant either mandatory or permissive withdrawal because the Bankruptcy Court does not have the authority to hear and decide the Trustee's counterclaims. After considering the factors for mandatory and permissive withdrawal, the Court finds neither appropriate. The Court finds SAG's claim untimely thus ineligible for mandatory withdrawal. In addition, because the counterclaims are core claims, the factors for permissive withdrawal dictate that this case should remain in bankruptcy court. Accordingly, the Court DENIES the motions and REMANDS the case to the United States Bankruptcy Court.

## I. BACKGROUND

In December 2011, SAG entered an Agreement to merge its assets with Anderson. The Agreement provided that Anderson would indemnify SAG against Anderson's liabilities with the Escrow funds, held in trust in the event that SAG faced claims relating to the asset acquisition.

In May 2012, SAG became the target of two class action lawsuits alleging successor-in-interest liability for Anderson's underwriting of the Initial Public Offering of Tibet Pharmaceuticals, Inc. *In re Anderson & Strudwick, Inc.*, No. 14-32679, 2015 WL 1651146, at *2 (Bankr. E.D. Va. Apr. 8, 2015). In May 2014, Downs (a defendant in the Tibet litigation) filed an involuntary bankruptcy petition against Anderson. *Id.* The Bankruptcy Court appointed the Trustee in June 2014.

In December 2014, SAG filed an action against the Trustee and Debtor to obtain a declaration from the Bankruptcy Court that the Escrow Funds were not a part of the Debtor's estate and not subject to the bankruptcy proceeding. On January 2, 2015, the Trustee filed counterclaims alleging: 1) SAG is liable for all of Anderson's obligations under successor liability; or, alternatively, 2) the asset purchase is voidable as a fraudulent transfer under Virginia law.

On January 30, 2015, SAG filed a motion to dismiss the Trustee's counterclaims. The Bankruptcy Court denied SAG's motion on April 8, 2015, holding the Trustee had standing and the Trustee had properly alleged its fraudulent conveyance claims. The Bankruptcy Court set trial for October 5, 2015. SAG submitted its Motion to Withdraw the Reference and Supporting Memorandum of Law on May 26, 2015.

## II. DISCUSSION

Bankruptcy law provides two avenues by which a court can order a case withdrawn from the Bankruptcy Court: mandatory withdrawal or permissive withdrawal. 28 U.S.C. § 157(d).

### *1. Mandatory Withdrawal*

Under § 157(d), mandatory withdrawal requires (1) a timely motion of a party and (2) "that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

Section 157 does not specify what constitutes "timely" in this context. Courts generally hold that, to meet the timeliness requirement, movants should file the motion soon after grounds for withdrawal become apparent. *See e.g., In re Mahlmann*, 149 B.R. 866, 869 (N.D. Ill. 1993); *In re H & W Motor Express Co.*, 343 B.R. 208 (N.D. Iowa 2006) (holding a five month delay following the service of a complaint rendered a motion to withdraw untimely)). Courts have held motions for withdrawal were not timely when filed as close as one month after discovering the grounds for dismissal. *In re Mahlmann*, 149 B.R. at 870 (holding untimely a motion filed one month after counterclaim). An important factor in the timeliness inquiry is whether the movant had discovered something to gain by forum shopping. *See, e.g., In re Stavriotis*, 111 B.R. 154, 158 (N.D. Ill. 1990) ("That the motion was filed as soon as [movant] realized withdrawal might be to its advantage is not sufficient to make the motion for withdrawal of the reference 'timely.'"). These cases clarify that the timeliness requirement does not provide a hard and fast deadline, but rather prevents a movant from "engaging in obstructionist tactics." *See In re Mahlmann*, 149 B.R. at 869.

SAG did not submit its Motion to Withdraw until May 26, 2015. At that point, SAG had already filed and the Bankruptcy Court had denied a motion to dismiss the counterclaims. SAG and the Trustee had taken part in months of discovery and a trial was set for October 5, 2015. The timeline of the Motion to Withdraw and its filing after an unfavorable ruling in Bankruptcy Court suggest that the motion is an attempt to delay.[1] SAG cites a large volume of cases, insisting the weight of precedent is in favor of permitting a lengthy filing period. Regardless of the time period in these precedents, they all hold that a movants should file a motion to withdraw at the first reasonable opportunity and courts will consider the motion untimely if the movant acts in bad faith.[2] In this case, SAG did not file a timely motion to withdraw. Accordingly, the Court denies mandatory withdrawal.

### 2. *Permissive Withdrawal*

District courts consider permissive withdrawals on a case-by-case basis. This Court has used the following factors to determine whether a permissive withdrawal is appropriate: 1) whether a proceeding is core or non-core; 2) the uniform administration of bankruptcy proceedings; 3) expediting the bankruptcy process and promoting judicial economy; 4) efficient use of debtors' and creditors' resources; 5) reduction of forum shopping; and finally, 6) the preservation of the right to a jury trial. *See, e.g., In re QSM, LLC*, 453 B.R. 807, 809-10 (E.D.

---

[1] *Stern v. Marshall*, put it best: "If [the Movant] believed that the Bankruptcy Court lacked the authority to decide his claim. . . , then he should have said so—and said so promptly. . . . Instead, [the Movant] repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad." 131 S. Ct. 2594, 2608 (2011) (citations omitted).

[2] A review of SAG's string of supporting parenthetical cases reveals exculpatory or nonprejudicial circumstances for the delays in filing the motion to withdraw. *In re Sevko*, which SAG relies on heavily, accords with the precedents we have adopted as instructive in recognizing "that the test for timeliness of a motion to withdraw reference is either as soon as possible, or at the first reasonably opportunity after the moving party has notice of the grounds for withdrawal[.]" 143 B.R. at 116. SAG has not timely filed its motion; therefore, this Court denies mandatory withdrawal.

Va. 2011). If the Court finds that the claims are core it "strongly militates against withdrawal of the reference." *Dwyer v. First Nat'l Bank (In re O'Brien)*, 414 B.R. 92, 98 (S.D. W. Va. 2009).

After *Stern v. Marshall,* a bankruptcy court must conduct a two-part analysis to determine if it has the authority to enter final judgment in a proceeding. A bankruptcy court must determine (1) whether a proceeding is "core" and, thus, whether the court has statutory authority to finally adjudicate it; and (2) whether the court has the constitutional authority to enter such a final judgment. 28 U.S.C § 157; *Stern v. Marshall*, 131 S. Ct. 2594, 2608 (2011). Specifically, a bankruptcy court cannot enter a "final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's claim of proof." *Id.* at 2620. In order for the Bankruptcy Court to have jurisdiction to decide such a claim, the claim must either "stem[] from the bankruptcy itself[,] or would necessarily be resolved in the claims allowance process." *Id.* at 2618.

Trustee's counterclaims fall under § 157(b)(2)'s definition of core claims because the Trustee asserts counterclaims against "persons filing claims against the estate" and the counterclaims seek "to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. §§ 157(b)(2)(C), (H). The Trustee's counterclaims focus on establishing that the Escrow Funds belong to Anderson's bankruptcy estate and cannot indemnify SAG. Both parties assert rights to the Escrow Funds and thus the Trustee's counterclaim falls into the counterclaims recognized as core by § 157(b)(2)(C). In addition, the Trustee asserts a core claim over the Escrow Funds because he alleges that Anderson's merger with SAG was a fraudulent conveyance. *See* 28 U.S.C. § 157(b)(2)(H).

The Trustee's counterclaims do not qualify as *Stern* claims because the counterclaims would necessarily be resolved in the claims allowance process. In fact, Trustee's counterclaims

seek to establish the converse of SAG's adversary action in the bankruptcy court. SAG's adversary action among other issues sought a declaration that "the Escrowed funds were placed in the Escrow Account pursuant to an arm's length purchase of the Debtor's [Anderson's] assets." (Bankr. Comp. at 9.) Trustee's successor claim seeks to prove the exact opposite: that the purchase was not in fact an arm's length purchase, and thus SAG is a successor to Anderson, making indemnification inapplicable.[3]

The remainder of the permissive factors does not call for a detailed analysis. The Court finds no evidence to suggest that withdrawing reference will promote the uniform administration of bankruptcy law. Keeping the case in bankruptcy court serves judicial economy and expedites the bankruptcy process because of the Bankruptcy Court's familiarity with the issues in this case. In addition, keeping the case in the Bankruptcy Court promotes a more efficient use of the Trustee's resources.

The chief factor in determining the propriety of permissive withdrawal, whether the claim is core, and most of the other factors cut against SAG. Accordingly, the Court denies permissive withdrawal.

---

[3] In the alternative, SAG has consented to the authority of the bankruptcy court to hear its claim as well as the Trustee's counterclaims. The Supreme Court in *Wellness* held that the right to have claims adjudicated in an Article III court is a personal right that can be waived both explicitly and impliedly. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015). The Supreme Court added that the waiver must be knowing and voluntary, the party should have been "made aware of the need for consent and the right to refuse it," and with this knowledge still voluntarily appear to try its case before a non-Article III court. *Id.* at 1948 (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)). SAG initiated the proceeding in Bankruptcy Court. SAG submitted a proof of claim asserting its rights in Bankruptcy Court a month later. SAG waived its right to have its claims heard by an Article III court by submitting to the equitable jurisdiction of the Bankruptcy Court.

## CONCLUSION

For the foregoing reasons, the Court DENIES SAG's motion to withdraw reference. The Court DENIES as MOOT SAG's motions to sever the counterclaims, transfer and consolidate.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: September 4, 2015
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge